Robert H. Miller and Doris K. Miller v. Commissioner.
Miller v. Commissioner
Docket No. 70402.
United States Tax Court
T.C. Memo 1961-45; 1961 Tax Ct. Memo LEXIS 301; 20 T.C.M. (CCH) 245; T.C.M. (RIA) 61045; 13 Oil & Gas Rep. 930; February 23, 1961
*301 Held that oil and gas leases sold in the years in question by the petitioner and the partnerships of which he was a member did not constitute property held primarily for sale to customers in the ordinary course of a trade or business, but constituted property used in the trade or business of development of oil properties and production of oil and that the gains from the sales are to be considered as gains from the sale of capital assets held for more than 6 months under section 117(j) of the Internal Revenue Code of 1939 and section 1231 of the Internal Revenue Code of 1954. Joseph D. Peeler, Esq., 621 S. Hope St., Los Angeles, Calif., for the petitioners. Douglas W. Argue, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax for the calendar years 1953, 1954, and 1955 in the respective amounts of $40,864.58, $10,462.38, and $21,679.09. A number of issues have been disposed of by stipulations of the parties and these will be taken into account in the recomputation under Rule 50. The parties also stipulated that the amount of self-employment income for each year and the amount of deductions for *302 the years 1954 and 1955 on account of medical expenses would be computed in the recomputation under Rule 50. The only issue remaining for decision is whether gains from the sales of oil and gas leases during each of the years in question are taxable as ordinary income as determined by the respondent or as long-term capital gains as contended by the petitioners. Findings of Fact Some of the facts are stipulated and the stipulations are incorporated herein by this reference. The petitioners are husband and wife residing in Beverly Hills, California. They filed joint income tax returns for the calendar years 1953, 1954, and 1955 with the district director of internal revenue at Los Angeles, California. When the term "the petitioner" is used hereinafter it will refer to Robert H. Miller. The petitioner was educated in Europe and received degrees in geology. In 1924 he came to the United States as an employee of the Royal Dutch Shell Oil Company and for a three-year period conducted geophysical surveys in Texas and California, where he discovered two oil fields. He left that company at the end of 1927 and, from then until 1932, he conducted his own business in California as a geophysical *303 consultant, making geophysical surveys for various oil companies. In 1928, the petitioner, in association with another individual, leased a block of land near Oxnard, California, and later assigned part of the acreage to the Texas Company in consideration of their drilling a well. The well was a dry hole. In 1930, he in association with another individual leased about 6,000 acres near Santa Maria, California, but had to abandon the project because he was financially unable to pay the rentals. This area was later successfully developed by others and became the Santa Maria Oil Field. In 1933, in association with another individual he leased several hundred acres near Redondo, California, and assigned part of the acreage to Mohawk Petroleum Company for the drilling of two wells, both of which were unsuccessful. In 1933, the petitioner was employed by Mohawk Petroleum Company as drilling superintendent, engineer, and geologist in the San Joaquin Valley, California. His arrangements with that company permitted him to engage in other ventures on his own time. In 1935, with some associates, petitioner leased a block of acreage in the San Joaquin Valley and drilled a dry well with his own *304 crew. In 1936, with another individual, he drilled another well at McKittrick, which was also dry. In 1938, with another individual, he drilled a dry hole on the northeast edge of the Santa Maria Field, which was then producing. Subsequent developments indicated that if they had drilled a hundred feet deeper they would have been successful. Also in 1938 he drilled a well adjacent to the Fruitvale Oil Field, where the Gulf Oil Corporation was the chief operator. Petitioner shortly thereafter accepted employment with Gulf Oil Corporation and from 1939 to about 1942 was district geologist for that company with headquarters in Bakersfield, California. From 1942 to 1950, the petitioner conducted his own business known as Miller Geophysical Company, making geophysical surveys for various major oil companies. He covered a wide territory from Canada to the Bahama Banks and from California to Florida. The business was successful during the war, but after the war competition increased, business fell off, and the petitioner undertook other business ventures. In 1947 and subsequent years the petitioner organized several partnerships or joint ventures to prospect for oil under Federal oil and gas *305 leases covering areas in the Federal public domain located in Colorado, Utah, Nevada, New Mexico, and Wyoming known as "wildcat" areas, that is, areas which had been classified by the Federal Geological Survey as not known to contain oil. [1] *306 During the period from 1947 to 1951, the petitioner and his partners in the various partnerships prospected nearly 750,000 acres of the public domain and paid the United States over $300,000 for the privilege. Generally they attempted to obtain large blocks of leases in order to acquire oil structures. At one time the petitioner held approximately 320 leases, representing 400,000 acres. Due to certain restrictions with respect to the amount of land which might be leased to one person, the petitioner used various nominees, including his father-in-law Arthur J. Kralovec. [2] During this period the petitioner and his partners formed 8 to 10 units for the purpose of drilling wells. Before making application for leases, petitioner and his partners would map the geological formations on aerial photographs. After obtaining leases they would continue evaluating the possibilities of oil by running geological tests. When studies indicated that there was a good chance for commercial production, a unit would usually be formed and a well drilled. Those leased areas which did not appear promising were nevertheless held until further *307 rent became due, at which time they were re-evaluated to determine whether the leases were worth keeping. In the interim if any one else became interested in these, the petitioner and his partners were willing to sell the leases. During 1951 the petitioner sold a working interest in the Blanding unit area for an amount of $4,883.73, which was reported in the petitioners' joint income tax return for the calendar year 1951 as long-term capital gain. Upon audit of this return the respondent made no change in this treatment. In late 1951 and 1952 the petitioner and his partners realized that their high expectations *308 were not going to be realized and it was decided that they would cease taking leases and attempting to find oil on the public domain, and that no more money would be expended for further development of the leases which they held. The petitioner, although considering the leases worthless, continued to hold them until further rent became due since withdrawal of the leases would have involved considerable paper work. The petitioner and his partners were willing to sell these leases if anyone made an offer for them. The petitioner's partners gave him control over the holding and disposition of these remaining leases. Applications for oil leases which had not been issued were withdrawn in order to obtain refunds of the amounts paid with respect thereto. Thereafter the petitioner spent little or no time searching for oil and devoted more time to prospecting for uranium. From time to time thereafter oil companies and others became interested in some of these leases and offered to purchase them. In one area, the Uintah Basin, renewed interest occurred in 1952 because of the possibility of a market for gas through the construction of a pipeline along the Wyoming and Colorado border. During *309 the years in question, 1953, 1954, and 1955, the petitioner entered into several transactions involving sales of leases which had been held by him in partnership with his wife and others and realized gains thereon which are the subject of controversy herein. Pursuant to his agreement with Kralovec, in some cases the petitioner obtained from the purchasers an overriding royalty for Kralovec. [3]
There are described hereinafter the activities of each partnership, including sales of leases during the taxable *310 years in question and other years. I. W. Bosworth and Associates As of July 1, 1947, the petitioner entered into a partnership with I. W. Bosworth and Glenn Ferguson known as I. W. Bosworth and Associates. Prior to 1949 this partnership acquired leases on Federal and state lands covering 12 prospective oil structures in New Mexico and Wyoming. In 1947 and 1948 it spent about $7,000 in mapping and prospecting these areas. During its existence the partnership expended about $12,000 on field expenses, about $50,000 as rentals to the United States Government, and about $23,000 in intangible drilling costs. It was found that a dry well had been drilled near one of the structures at New Castle, Wyoming, and accordingly the leases with respect to that structure were placed by the partnership in the category of those that would not be further exploited. On October 7, 1948, the partnership sold those leases at a profit of $14,280, and the partnership reported the gain as a long-term capital gain in its return for its taxable year ended January 31, 1949. Upon audit of the return the respondent made no change in the capital gain treatment. After further evaluation it was determined by the partners *311 that 11 of the 12 structures were not suitable for drilling. The one prospect considered good was at Nash Draw, New Mexico. In order to obtain money for drilling, some of the leases in this area were sold during the fiscal year ended January 31, 1950, at a gain of $70,374.50, which was reported in the partnership return for that year as long-term capital gain, and which, upon audit, the respondent accepted as correct. The estimated cost of a completed well was $100,000, but the well was unsuccessful and was not completed; the amount expended for drilling was about $20,000. After the unsuccessful well at Nash Draw, the partnership surrendered applications for other leases in order to obtain refunds before the leases were issued. Seven of the 12 prospects were abandoned. However, the partnership retained the leases which had been issued in order to await developments. During the fiscal year ended January 31, 1951, the partnership sold 5 of the remaining leases and in its return reported capital gain of $32,783.79. Upon audit the respondent made no change in this capital gain treatment. During the fiscal year ended January 31, 1952, the partnership sold working interests in New Mexico *312 and Wyoming oil leases and reported long-term capital gain of $21,782. The partnership return for that year was not audited by the respondent. On December 3, 1952, the partnership transferred to Shell Oil Company a lease covering land at Buffalo, Wyoming, for $10,000. This lease had been acquired in November 1949. In its return for the fiscal year ended January 31, 1953, the partnership reported this amount as long-term capital gain. The petitioners received as their share of this gain $3,333.34, which was included in long-term capital gains reported by them in their return for the calendar year 1953. On May 1, 1954, the partnership transferred to Arch Deuel for $21,972 its remaining properties consisting of three leases covering land located in Wyoming. These leases had been acquired in November 1949. The partnership reported this amount as long-term capital gain in its income tax return for the fiscal year ended January 31, 1955. The petitioners received $7,324 of this amount which was included in long-term capital gains reported in their income tax return for the calendar year 1955. Equity Oil Company
Equity Oil Company was organized as a joint venture on May 1, 1949, by the petitioner, *313 Glenn C. Ferguson, John N. Huber, and I. W. Bosworth. It took over some oil and gas leases located in Nevada and California, which had been obtained by Ferguson, Bosworth and the petitioner. Additional leases were taken in Wyoming. The joint venture spent about $700 on aerial maps and a total field expense of $5,000 in 1950. Altogether, rental of $30,000 was paid to the United States for the right to prospect on the public domain. In 1950 the joint venture associated with others in drilling the Mott well in California, petitioner being the operator. The well was dry. On its partnership return for the calendar year 1950, Equity Oil Company reported long-term capital gains on five separate sales of oil and gas leases located in Nevada and Wyoming in the total amount of $95,595.90. Upon audit of the return, the respondent made no change in the capital gain treatment reported therein. On its partnership return for the calendar year 1951, Equity Oil Company reported a long-term capital gain of $1,600 on one sale of a working interest in oil property. This return was not audited by respondent. On its partnership return for the calendar year 1952, Equity Oil Company reported a long-term *314 capital gain of $1,850.85 on the sale of a working interest in oil property. This return was not audited by respondent. On May 28, 1954, Equity Oil Company transferred three leases, covering 2,668.05 acres of land located at Tisdale Anticline, Wyoming, to J. Ray McDermott for $12,340.25, or approximately $5 an acre. McDermott agreed to drill a well in a location of the partnership's choice. The partnership retained an interest in 80 acres near the well. The well was dry. The partnership in its return for the calendar year 1954, which was its final partnership return, reported a capital gain from this transaction of $12,340.25. The petitioners received $3,085.06 from this transaction and included that amount in long-term capital gains reported on their return for the year 1954. Tallant, Gaul and Miller As of March 1, 1950, the petitioner, together with George H. Gaul and R. L. Tallant, formed a joint venture known as Tallant, Gaul and Miller. It was organized to acquire Federal oil and gas leases in the Utah and Western Colorado area known as Uintah Basin. Prior to the formation of this partnership, Tallant and Gaul had been working for the petitioner in Utah and bordering states, *315 and petitioner had paid them and other geologists nearly $80,000 for their services. As a result of their field mapping in the Uintah Basin, petitioner had leased about 140,000 acres from the United States at a cost of about $70,000 in first year rentals, covering about a dozen prospects. Tallant, Gaul and Miller was organized to give Tallant and Gaul a partnership interest in the remainder of the prospects and in any future prospects they might find. During its first taxable year ended February 28, 1951, this venture paid $88,866.70 to the United States in rentals for the right to prospect on the public domain. During its existence this venture filed applications for 80 leases in Nevada and Utah covering more than 100,000 acres, of which three leases were sold, eleven were committed to the Antelope Creek Unit and eight were committed to the proposed Sowers Creek Unit. The remaining 58 leases were abandoned. After the liquidation of the joint venture in 1951, the remaining leases were considered valueless but were retained on file by the petitioner on behalf of all the partners. On its partnership return for the taxable year ended February 28, 1951, Tallant, Gaul and Miller reported *316 long-term capital gains of $23,201 on two transactions involving the sale of oil leases in Nevada and Utah. Upon audit of this return, the respondent made no change in the capital gain treatment. On December 10, 1951, this partnership sold a part of its working interest in the Antelope Creek Unit to a subsidiary of Standard Oil Company of California for $181,300. At that time another partnership, Tallant and Miller, sold a portion of its working interest in this unit to the same subsidiary of the Standard Oil Company of California. In this manner such company acquired a three-fourths working interest in the unit. The operating agreement with the company required that a well be drilled. The petitioner as representative of the two partnerships was required to furnish one-fourth of the expense of the well until the contribution reached $35,000, when the interest of the partnerships became carried working interests. Actually two wells were drilled, one completed in 1952 and the other in 1953. Although the wells were not dry, they were unable to produce profitably due to the cold climate of the area. In its return for the taxable period ended December 31, 1951, which was its last partnership *317 return, the partnership of Tallant, Gaul, and Miller reported the amount of $181,300 as a long-term capital gain. Therein it also reported as long-term capital gain an amount of $72,824.13, which had been received from two other sales of working interests in the unitized areas known as the South Myton and Sowers Creek units. Upon audit of this return the respondent made no change in the capital gain treatment. Tallant and Miller On July 1, 1950, the petitioner and R. L. Tallant formed a joint venture, known as Tallant and Miller. During its first taxable year ended June 30, 1951, it paid $95,363.52 in rentals to the United States and during the fiscal period ended December 31, 1951, it paid rentals of $18,121.50 in acquiring leases on large acreages. In all, this joint venture filed applications for 93 oil and gas leases in Utah and California. During its existence, 10 leases were committed to the proposed Blanding Unit, 10 leases were committed to the Antelope Creek Unit and 64 leases were abandoned. On its partnership return for the fiscal year ended June 30, 1951, Tallant and Miller reported no capital gains. On its partnership return for the fiscal period ended December 31, 1951, *318 which was its last return, Tallant and Miller reported capital gains of $223,552.67. This sum represented $168,700 from the sale of part of the Tallant and Miller working interest in the Antelope Creek Unit area on December 10, 1951, to a subsidiary of Standard Oil of California and $54,852.67 from the sale of a working interest in the Blanding Unit area on December 31, 1951. Upon audit of this return, the respondent made no change in the capital gain treatment. This partnership as well as the Tallant, Gaul and Miller partnership ceased active operations about the end of 1951, the petitioner and Gaul going into uranium prospecting, and Tallant departing for Spain. Only a few leases were left and the petitioner kept them in his file so as to have them in the event oil should be discovered near the property covered by such leases. In the case of any sales the petitioner accounted to his partners. On March 20, 1953, the petitioner transferred to General Petroleum Company five leases covering 12,211.70 acres at Douglas Pass, Colorado, for $61,058.50, or approximately $5 per acre. Those leases had been acquired between August 1, 1951 and January 1, 1952. Of this amount, $21,989.06 belonged *319 and was paid to Tallant and $39,077.44 was retained by the petitioner. General Petroleum was operating southeast of this property or the same anticline and the sale was made on the basis of an unsolicited offer by General Petroleum. The petitioners included the amount of $39,077.44 as part of the long-term capital gains reported on their return for the calendar year 1953. On August 14, 1953, the petitioner also transferred to General Petroleum Company one lease covering 560 acres located at Piceance Creek, Colorado, for $3,640, or $6.50 per acre. This lease had been acquired on August 1, 1951. This sale was made at the solicitation of General Petroleum Company. Of this amount, petitioner sent $1,310.40 to Tallant and retained the balance of $2,329.60, which was included in long-term capital gains reported by the petitioners in their joint return for the calendar year 1953. On September 14, 1953, the petitioner transferred two leases to Caroline Lewis Hunt covering 5,120 acres located at Circle Cliffs, Utah, for $20,480, or approximately $4 per acre. These leases had been acquired on July 1, 1951. Of this amount, the petitioner sent Tallant a check for $7,372.80 and retained the remainder *320 of $13,107.20, which was included in the amount of long-term capital gains reported by the petitioners in their joint income tax return for the calendar year 1953. Miller and Miller On December 31, 1951, the petitioner and his wife Doris K. Miller organized a partnership known as Miller and Miller, which took over certain oil interests which the individuals owned. This partnership in its return for the calendar year 1952 reported long-term capital gains from the sale of a lease described as Utah Oil Property in the amount of $19,200 and from the sale of South Bitter Creek leases in the amount of $22,994.80. These amounts were included along with other receipts by the petitioners in their joint income tax return for the calendar year 1952 as long-term capital gains. Upon audit the respondent accepted this return as filed. On June 17, 1953, this partnership transferred to Continental Oil Company seven leases covering 13,998.69 acres at South Myton, Utah, for $39,812.07, or approximately $3 per acre. These leases had been acquired between June 1 and July 1, 1951. The petitioner started the unitization of this area known as the Kralovec unit area for Continental Oil Company, and after *321 the transfer of the leases Continental Oil Company completed the formation of the unit. The petitioners included the amount of $39,812.07 in long-term capital gains reported on their joint return for the calendar year 1953. On May 14, 1954, this partnership transferred to Paul T. Walton, representing Shell Oil Company, four leases covering 3,650.48 acres at Tie Fork, Utah, for $10,951.44, or approximately $3 per acre. These leases had been acquired on June 1, 1951. On August 2, 1954, this partnership transferred to Julius F. Dreyfuss seven leases covering 17,913.13 acres of land in Duchesne County, Utah, for $12,549.71, or about 70 cents per acre. These leases were acquired between January 1 and March 1, 1952. The purchaser desired these leases because it was believed that oil and gas lessees might be given a preference with respect to obtaining uranium leases. In their joint return for the calendar year 1954, the petitioners included the above amounts of $10,951.44 and $12,549.71 in the long-term capital gains reported. During 1953 the petitioner, while prospecting for uranium, saw an anticline on which he learned that Atlantic Oil and Refining Company proposed to drill a well. He *322 accordingly acquired on July 1, 1953, three leases covering acreage on this anticline located near San Raphael, Utah. His purpose in obtaining these leases was to be in a position, if Atlantic Oil and Refining Company discovered oil, to drill some leases of his own and have an interest in a successful field. These three leases and two others were all the oil and gas leases which the petitioner acquired after 1952. On January 6, 1955, he or the partnership transferred one of these leases covering 2,542.77 acres to Leland W. Cox, representing Standard Oil Company, for $7,633.31, or abount $3 per acre. The petitioner retained no overriding royalty, but the assignee agreed, in addition to the immediate cash payment, to make a 2 1/2 percent oil and gas payment out of production up to a maximum total of $300 per acre. On February 8, 1955, the partnership transferred to Carl H. Noel an interest in a lease covering 960 acres located at Oil Springs, Utah, for $2,880, or $3 per acre. This lease had been acquired on July 1, 1951. This sale was made upon the solicitation of Noel who stated that he was attempting to form a unit. On February 21, 1955, the partnership transferred to Pure Oil Company *323 a lease covering 2,462.64 acres of land located at Piceance Creek, Colorado, for $6,156.60, or about $2,50 per acre. This was the final remnant of a block of 20,000 acres which the petitioner had held in this area. This lease had been acquired on August 1, 1951. Pure Oil Company wanted this lease in order to complete a unit. The above amounts of $7,633.31, $2,880, and $6,156.60 were included among long term capital gains reported by the petitioners in their joint return for the calendar year 1955. During 1956 and 1957 this partnership continued to dispose of leases. In its return for 1956 it reported long-term capital gain of $36,830.52 from sales of lease interests in the Piceance Creek, San Raphael, Tie Fork, and South Myton areas. In its return for the year 1957 the partnership reported long-term capital gain of $4,154.68 from two sales of interests in oil and gas leases. Over the period 1949 through 1955 none of the various partnerships referred to above reported in its income tax returns any gross receipts from business, although each did report capital gains from sales of oil leases. In nearly every year they reported ordinary net loss resulting from deductions claimed for business *324 expenses, rentals, etc. During the years in question, 1953 through 1955, the partnership of Miller and Miller apparently treated the petitioner's interests in the other partnerships as being assets of the partnership of Miller and Miller, since in its returns for those years it reported the petitioner's share of ordinary net gains or losses and his share of long-term capital gains reported by such other partnerships. Such partnership of Miller and Miller reflected the following in its returns for the calendar years 1953, 1954, and 1955: 1953
1954
1955
Gross receipts from business
0
0
0
Gross profit (or loss) from business
($17,976.94)
($10,864.88)
($33,668.75)
Ordinary income (or loss) from partnerships -
I. W. Bosworth and Associates and Equity Oil
Company
(528.29)
919.84
(134.50)
Net income (or loss) from other sources or operations
(5,072.73)
16,374.85
3,215.48
Business deductions -
Lease rental and other
4,436.61
20,658.04 b
Ordinary net income (or loss)
(27,914.57)
(14,228.23)
(30,587.77)
Net long-term capital gain a *325 93,762.74
68,261.54
115,743.11 In their joint income tax returns for the calendar years 1953, 1954, and 1955 the petitioners reported the ordinary net losses and the capital gains of the Miller and Miller partnership and thus reflected their share of the reported ordinary gains or losses and capital gains of each of the other partnerships. Their joint returns for those years show the following: 1953
1954
1955
Ordinary Income (or loss) from Miller and Miller
Partnership
($27,914.57)
($29,710.83) * *326 ($30,587.77)
Long-Term Capital Gains from Miller and Miller
Partnership (one-half reported)
46,881.37
34,130.77
57,871.55
Capital Gain from Sale of Oil Royalty
5,148.96
Income from Oil Royalties (net after depletion)
147.86
In the notice of deficiency the respondent determined that the petitioners were in the business of buying and selling oil and gas leases and properties, that the leases sold in the years in question did not qualify as capital assets under section 117 of the Internal Revenue Code of 1939 and section 1221 of the Internal Revenue Code of 1954, and that the profits from the sales of such leases constituted ordinary income under section 22(a) of the 1939 Code and section 61 of the 1954 Code rather than long-term capital gains. The amounts so determined to be ordinary income are as follows: 1953
Profit
Douglas oil property
$39,077.44
South Myton oil property
39,812.07
Piceance Creek oil property
2,329.60
Circle Cliffs oil property
13,107.20
Petitioner's share of net long-term
capital gains of I. W. Bosworth
and Associates partnership
3,333.34
Total
$97,659.65
1954
Tie Fork oil property
$10,951.44
Utah oil
12,549.71
Petitioner's share of long-term
capital gains reported by Equity
Oil Company
3,085.06
Total
$26,586.21
1955
San Raphael oil property
$ 7,633.31
Oil Springs oil property
2,880.00
Piceance Creek oil property
6,156.60
Petitioner's share of net long-term
capital gains reported by I. W.
Bosworth and Associates
7,324.00
Total
$23,993.91
*327 The petitioner and the various partnerships did not engage in the purchase of leases. The leases which were sold in the years in question were those which had been acquired by him or his partners or his nominees upon application to the United States Government covering land in the public domain. The petitioner did not have a broker's license to sell leases nor did he ever offer leases for sale or solicit offers. The leases which he sold in the years in question were those which he had concluded did not justify the further expenditure of money for development, but which purchasers with a different view of the geology considered desirable. All sales were made upon solicitation of the purchasers. Such purchasers could ascertain the ownership of any lease by reference to records kept in the land offices in each state. The only leases acquired by the petitioner subsequent to 1952, other than the three described hereinabove, were in the Piceance Creek area. The petitioner had allowed certain leases in that area to lapse since he thought the prospects were not good, but sometime during the years in question the Ohio Oil Company contacted petitioner and wanted to purchase any leases he had *328 in the area. The petitioner did not know whether he still held any leases so he made inquiry and searched among his records and found that some of the leases had expired. He thereupon made application for new leases and these were sold to the Ohio Oil Company in years subsequent to the years in question. In the years in question, 1953, 1954, and 1955, the petitioners were not engaged in the business of acquiring and selling oil and gas leases, nor were the partnerships. For a number of years prior to the years in question they and the partnerships were engaged in the business of acquiring oil and gas leases and developing the property for the purpose of discovering and producing oil. The leases which were sold in the years in question constituted property used in such trade or business of the petitioner or the partnerships and did not constitute property held primarily for sale to customers in the ordinary course of the trade or business of the petitioner or the partnerships. Opinion The respondent held that the oil and gas leases sold by the petitioner and the partnerships did not constitute capital assets within the meaning of section 117 of the Internal Revenue Code of 1939 and section 1221 of the Internal Revenue Code of 1954. *329 The petitioner contends that these leases constituted property used in trade or business held for more than six months, and that under section 117(j) of the Internal Revenue Code of 1939 and section 1231 of the Internal Revenue Code of 1954 the gains are to be considered as gains from sales or exchanges of capital assets held for more than six months. There are set forth in the margin pertinent provisions of section 117 of the Internal Revenue Code of 1939, [4] *330 *331 which are substantially the same as the provisions of sections 1221 and 1231 of the Internal Revenue Code of 1954. The interest of a lessee in oil and gas constitutes an interest in real property. Vern W. Bailey, 21 T.C. 678, and I.T. 3693, 1944-C.B. 272. Accordingly, the leases here involved qualify as real property within the meaning of section 117(j) of the 1939 Code and section 1231 of the 1954 Code, and they were all held for more than six months. The issue is whether they constituted property used in trade or business or whether they were held primarily for sale to customers in the ordinary course of trade or business. [5] *332 The leases which were sold in the years in question were oil leases covering land in the public domain which the petitioner or his partners or nominees had obtained upon applications to the United States Government. The petitioner testified that the purpose in obtaining the leases was to explore for oil with respect to each lease and to take title to any oil found and produced. In years prior to the years in question, the petitioner and his partners or nominees obtained many such leases and expended large sums in prospecting and drilling. Many of the leases were committed to units for the purpose of drilling for oil. Upon the basis of surveys made the petitioner and his partners from time to time reached the conclusion that some areas did not justify the further expenditure of money and abandoned the idea of *333 further development with respect thereto. By 1953 the petitioner and his partners had concluded that none of the remaining leases which were held had sufficient worth to justify further expenditures and had ceased active operations and gave into other lines of endeavor. The petitioner continued to hold the leases on behalf of himself and his partners so long as it was unnecessary to pay any further rental with respect thereto. He testified that he and his partners considered the leases worthless; that while no definite action was taken to abandon them, since to withdraw the leases would have entailed considerable paper work, they were in effect abandoned by the decision to place them in a file and take no further action with respect to them; that it was decided that no further rental would be paid; that if in the meantime anyone discovered oil in the vicinity he also would have drilled for oil; and that in the meantime if anyone approached him with an offer to purchase any of the leases he would have been willing to sell. He further testified in effect that he considered the leases as of little or no value even though it developed that there were others, with different views concerning *334 the geology, who were willing to pay substantial sums for some of the leases. We are satisfied from the petitioner's testimony and from the record as a whole that the leases in question were not acquired with a view to the sale thereof, but rather for the purpose of development and production of oil, and that they were not held at any time for sale to customers in the ordinary course of a trade or business. The petitioner did not obtain a broker's license to sell leases, he never bought any leases, and he did not solicit any sales. During the three years in question there were only twelve transactions; and there was about the same yearly average number of transactions involving sales of leases and working interests over the period 1948 through 1957. The leases sold in the years in question had been held for an average of about three years. Prior to the years in question the only interests sold consisted of those which it was necessary to sell in order to obtain funds for development of remaining properties or which were no longer considered suitable for exploitation. The sales in the years in question consisted of property in the latter category, and were in the nature of liquidations *335 of property which had been acquired for use in the business of discovering and producing oil, and which had been so used in that the lands had been surveyed and evaluated for oil properties, but which had, in the opinion of the petitioner and his partners, been proven of no further value for the production of oil. Under these circumstances it cannot be considered that the leases lost their character as being real property used in the trade or business within the meaning of the statute. See Carter-Colton Cigar Co., 9 T.C. 219, and cases cited therein. While the ultimate question is the purpose for which the property was held at the time of sale, we think that under the present circumstances the property was not at any time converted into property held primarily for sale to customers. As stated in Vern W. Bailey, supra: "The factor which must be given greatest weight is the purpose for which the property was held during the period in question. Walter R. Crabtree, 20 T.C. 841; Carl Marks & Co., 12 T.C. 1196 (1949). This purpose must be determined from the evidence as to the intention of the taxpayer at the time of acquisition and his conduct during the holding period." The respondent *336 makes much of the fact that the petitioner and the partnerships over the years in question and prior years reported no ordinary income from oil operations, or at least very little income, whereas large amounts were reported as long-term capital gains from sales of leases. However, we think that this was merely fortuitous. As stated by the petitioner in his testimony, his experience in attempting to find oil in wildcat territories was not unusual. If one area had proven productive the situation would have been entirely different. The respondent relies heavily on Greene v. Commissioner (C.A. 5), 141 F. 2d 645, affirming a Memorandum Opinion of this Court, in which it was held that oil leases which were sold constituted property held primarily for sale to customers in the ordinary course of a trade or business. However each case must be decided upon the basis of its own facts and circumstances. That case involved facts quite dissimilar to those here involved and there was not the direct evidence of intent which is here presented. Based upon the whole record, we have concluded and have found as a fact that the leases which were sold in the years in question did not constitute property *337 held primarily for sale to customers in the ordinary course of any trade or business, but that they constituted property used in the trade or business of the petitioner or the partnerships. Accordingly, under the provisions of section 117(j) of the Internal Revenue Code of 1939 and section 1231 of the Internal Revenue Code of 1954, the gains from the sales are to be considered as gains from the sale of capital assets held for more than six months. Decision will be entered under Rule 50. Footnotes
1. The Federal Government grants leases, known as noncompetitive leases, covering wildcat areas, to the first qualified applicant. The application must be accompanied by a filing fee of $10 and the first year's rental at the rate of 50 cents per acre. The acreage in a lease is limited to 2,560 acres. The lease is limited to a period of five years unless oil or gas is produced in paying quantities, in which case the lease continues so long as such production continues. However, there is no obligation to drill. The United States reserves a 12 1/2 percent royalty. Prior to production no rental is charged for the second and third years of the lease, and the rental for the fourth and fifth years is 25 cents per acre per year. In such lease the lessee agrees that upon demand he will subscribe to and operate under a cooperative or unit plan for the development and operation of the area or field. If the area is unitized, the provisions for rental payments, minimum drilling requirements, and royalties may be waived or reduced.
2. The petitioner's arrangement with Kralovec and the other nominees was that in consideration of their acting as nominees and thereby relinquishing their rights to file applications on their own behalf, the nominees should be entitled to 1/4 of 1 percent royalty. The petitioner paid all filing fees, rentals, and bond premiums and agreed to hold the applicants harmless from any liability whatever. The agreement was that the petitioner held all the rights to such leases, including the right to sell, subject only to the 12 3/4 percent royalty reserves by the United States and the nominees.↩
3. In a letter addressed by petitioner to Kralovec on December 27, 1952, the petitioner referred to the leases which he held in the Uintah Basin, stating that the area had been disappointing from the standpoint of discoveries, that he had decided to spend no more money in the area, that it was his intention to let the leases lapse as rentals became due, and that if anyone should buy any of the leases and be willing to pay an overriding royalty, the royalty should belong to Kralovec. In such letter the petitioner stated: "There is always the chance that someone will want to buy some of the lease blocks in the meantime, and in this way, I may recoup some of the money I have spent in drilling."↩
b. This includes $8,847.19 of claimed bad debt losses in connection with business other than oil and gas.↩
a. In the computation of the net figure for 1953 there was included $97,659.65 profit from sale of oil leases which had belonged to the three partnerships, I. W. Bosworth and Associates, Tallant and Miller, and Miller and Miller; in the computation of the net figure for 1954 there was included $26,586.21 profit from sale of oil leases which had been owned by Equity Oil Company and Miller and Miller; in the computation of the net figure for 1955 there was included $23,993.91 profit from sale of oil leases which had been owned by I. W. Bosworth and Associates and Miller and Miller. *. The ordinary loss reported by the petitioners in their individual return is greater than the ordinary loss reported by the partnership of Miller and Miller by approximately $15,000 since they chose to include dividend income of the partnership in that amount as a separate item of income, whereas the partnership's computation of loss had taken the dividend income into account.
4. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chater - (1) Capital assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; (B) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), or real property used in his trade or business; * * *
(j) Gains and Losses from Involuntary Conversion and from the Sale or Exchange of Certain Property Used in the Trade or Business. - (1) Definition of property used in the trade or business. - For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *. (2) General rule. - If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets.
5. By amendment to his answer, the respondent alleged that in some instances there was retained a royalty or other economic interest (apparently referring to those transactions in which the petitioner agreed with purchasers that Kralovec should have an overriding royalty) and that the transactions constituted subleasing arrangements with the consequence that the amounts received constituted bonuses or advanced royalties and hence ordinary income. However, on brief he specifically abandoned any such contention or theory.